**Web Pages Cited in the Opinion**

70 FR 7475, February 14, 2005

A-570-894<br>
Investigation<br>
**Public Document**<br>
IA/9: MR, KLR, JC

February 3, 2005

| | |
|---|---|
| **MEMORANDUM TO:** | Joseph A. Spetrini<br>Acting Assistant Secretary<br>  for Import Administration |
| **FROM:** | Barbara E. Tillman<br>Acting Deputy Assistant Secretary<br>  for Import Administration |
| **SUBJECT:** | Issues and Decision Memorandum for the Antidumping Duty Investigation of Certain Tissue Paper Products from the People's Republic of China |

## BACKGROUND

We have analyzed the case and rebuttal briefs of interested parties in the less-than-fair-value ("LTFV") investigation of certain tissue paper products from the People's Republic of China ("PRC"). As a result of our analysis, we have made changes from <u>Certain Tissue Paper Products and Certain Crepe Paper Products From the People's Republic of China: Notice of Preliminary Determinations of Sales at Less Than Fair Value, Affirmative Preliminary Determination of Critical Circumstances and Postponement of Final Determination for Certain Tissue Paper Products</u>, 69 FR 56407 (September 21, 2004) ("<u>Preliminary Determination</u>").

The merchandise covered by the order is certain tissue paper products as described in the "Scope of the Investigation" section of the <u>Federal Register</u> notice. The period of investigation ("POI") is July 1, 2003, through December 31, 2003. In accordance with section 351.309(c)(ii) of the Department of Commerce's ("the Department") regulations, we invited parties to comment on our <u>Preliminary Determination</u>.

After the <u>Preliminary Determination</u>, the Department conducted sales and factors verifications for the two Mandatory Respondents in the PRC. <u>See</u> <u>Memorandum from John Conniff and Hallie Zink to Alex Villanueva, Program Manager, regarding Verification of Sales and Factors of Production for Fujian Naoshan Paper Industry Group ("Fujian Naoshan") in the Antidumping Duty Investigation of Certain Tissue Paper Products from the People's Republic of China ("PRC") ("Fujian Naoshan Verification Report")</u> dated December 27, 2004; <u>see also</u> <u>Memorandum from Matthew Renkey and Kit Rudd to Alex Villanueva, Program Manager, regarding Verification of the Responses of China National Aero-Technology Import and Export Xiamen Corporation ("China National") with Regard to the Sales and Factors of Production of Certain Tissue Paper</u>

Products from the People's Republic of China ("PRC") ("China National Verification Report") dated January 6, 2005.

On January 12, 2005, the Mandatory Respondents[1] and the Petitioners[2] filed case briefs. On January 18, 2005, the Mandatory Respondents and the Petitioners filed rebuttal briefs. On January 18, 2005, Max Fortune and Winco submitted case briefs. On January 24, 2005, the Department held a public hearing in accordance with section 351.310(d) of the Department's regulations.

As noted in the Memorandum to Joseph A. Spetrini, Acting Assistant Secretary for Import Administration from Barabara E. Tillman, Deputy Assistant Secretary for Import Administration, AD/CVD Operations, Regarding Application of Total Adverse Facts Available to China National Aero-Technology Import and Export Xiamen Corporation ("China National") in the Final Determination of Sales at Less than Fair Value: Certain Tissue Paper Products from the People's Republic of China ("PRC"), dated February 3, 2005, and the Memorandum to Joseph A. Spetrini, Acting Assistant Secretary for Import Administration from Barabara E. Tillman, Deputy Assistant Secretary for Import Administration, AD/CVD Operations, Regarding Application of Total Adverse Facts Available to Fujian Naoshan ("Naoshan") in the Final Determination of Sales at Less than Fair Value: Certain Tissue Paper Products from the People's Republic of China ("PRC"), dated February 3, 2005, the Department has applied total adverse facts available to China National and Fujian Naoshan. As a result, all issues pertaining to China National's or Fujian Naoshan's margin calculations are moot. Therefore, the Department is not addressing the following issues raised by parties regarding China National's margin calculation: Adjustments to calculations for mixed packages, the appropriateness of the yield ratio for pulp from the petition, adjustment of the preliminary margin for China National, consideration of retail bags as direct materials, all comments regarding surrogate values, use of United States International Trade Commission ("ITC") Import Statistics as non-adverse facts available ("AFA"), mismatched factors of production for certain control numbers ("CONNUMs"), assignment of AFA for mismatched CONNUMs, use of differing methodologies in assigning partial AFA to mandatory respondents, valuation of Naoshan Cut-to-Length ("CTL") tissue factors of production ("FOP"), double-counting of FOP data, use of ink and dye databases, China National's separate rate, application of partial AFA if total AFA is not applied & China National's request that its affiliated parties receive the same cash deposit rate. However, the comments listed below are not mooted by the decision to apply total AFA and, as such, are addressed herein.

**GENERAL ISSUES:**

**Comment 1:   Treatment of Mixed Packages**
**Comment 2:   Calculation of the Surrogate Financial Ratios**

---

[1] China National and Fujian Naoshan (collectively, "Mandatory Respondents").

[2] Seaman Paper Company of Massachusetts Inc.; Eagle Tissue LLC; Flower City Tissue Mills Co.; Garlock Printing & Converting, Inc.; Paper Service Ltd.; Putney Paper Co., Ltd.; and the Paper, Allied-Industrial, Chemical and Energy Workers International Union AFL-CIO, CLC (collectively "Petitioners").

2

**Comment 3:   Request for Initiation of Circumvention Inquiry**
**Comment 4:   Section A Rate - Max Fortune Industrial Limited ("Max Fortune")**
**Comment 5:   Section A Rate - Hunan Winco Light Industry Product Import & Export Co. Ltd. ("Winco")**

**Comment 1:   Treatment of Mixed Packages**

China National states that the merchandise subject to this investigation consists of cut-to-length sheets of tissue paper. According to China National, during the POI, China National sold and reported a small amount of mixed packages of merchandise that contained both tissue paper sheets (subject merchandise) and other types of sheets (non-subject merchandise). China National states that as indicated on page 16 of its Section C response, mixed packages accounted for less than five percent of packages containing subject merchandise during the POI. China National explains that it requested that the Department exclude these packages from the margin calculation in its response.

China National notes that the Department declined to exclude these mixed packaged in the Preliminary Determination, stating that "the products under investigation are cut-to-length sheets of tissue paper, not packages of tissue paper." See Preliminary Determination, 69 FR at 56415. According to China National, however, this does not resolve the issue, as the price and FOP analysis is applied to packages, not individual sheets. China National argues that the inclusion of packages that contain both subject and non-subject sheets distorts the analysis, as it results in non-subject sheets being treated as if they were subject merchandise. China National notes that apparently in recognition of this difficulty, the Department stated in its Preliminary Determination that it added the value of the non-subject merchandise to normal value "analogous to the Department's practice of adding a respondent's packing costs." Id. However, China National argues, the non-subject sheets are not packing materials, they are merchandise in the same sense as the subject sheets, and the inclusion of mixed packages results in an inappropriate mixed margin calculation covering non-subject as well as subject merchandise.

China National argues that the Department has discretion in an investigation to disregard transactions that complicate or skew the margin calculations. See Final Determination of Sales at Less than Fair Value and Final Negative Determination of Critical Circumstances: Certain Color Television Receivers from the People's Republic of China, 69 FR 20594 (April 16, 2004) and accompanying Issues and Decision Memorandum at Comment 27 ("In less-than-fair value investigations, the Department is not required to examine all sales transactions in the United States. For this reason, our practice has been to disregard unusual transactions when they represent a small percentage (i.e., typically less than five percent) of a respondent's total sales"). Moreover, China National states that in numerous investigations, the Department has excluded particular sales if they are atypical and involve a heavy burden of reporting and verifying, even in some cases where those sales constituted more than five percent of overall sales to the United States. See, e.g., Preliminary Determination of Sales at Less than Fair Value and Postponement of Final Determination: Certain Softwood Lumber Products from Canada, 56 FR 56062, 56064-65 (November 6, 2001); Final Determination of Sales at Less than Fair Value: Antifriction Bearings (Other than Tapered Roller Bearings) and Parts Thereof from the Federal Republic of Germany, 54 FR 18992, 19029 (May 3, 1989); Preliminary

3

<u>Determination of Sales at Less Than Fair Value Investigation: Polyethylene Terephthalate Film, Sheet, and Strip from the Republic of Korea</u>, 55 FR 49668, 49669 (November 30, 1990);  <u>Notice of Final Determination of Sales at Less than Fair Value: Certain Cold-Rolled Carbon Steel Flat Products from Belgium</u>, 67 FR 62130 (October 3, 2002) and accompanying <u>Issues and Decision Memorandum</u> at Comment 1;  <u>Final Determination of Sales at Less than Fair Value:  Sweaters Wholly or in Chief Weight of Man-made Fiber from Taiwan</u>, 55 FR 34585 (August 23, 1990); and <u>Final Determination of Sales at Less than Fair Value:  Sweaters Wholly or in Chief Weight of Man-Made Fiber from the Republic of Korea</u>, 55 FR 32661 (August 10, 1990).

In their rebuttal brief, Petitioners argue that the Department should continue to include packages containing both subject merchandise and non-subject merchandise, though it should consider an alternative methodology to account for the non-subject merchandise in the final determination.

While China National reported that under five percent of the company's sales to the United States during the POI constituted mixed packages containing finished sheets of both subject and non-subject merchandise, Petitioners contend that the Department should continue to include these sales because they are significant and because excluding them from analysis could lead to circumvention of the antidumping order in subsequent reviews.  Petitioners state that contrary to China National's characterization, the percentage of the company's sales to the United States accounted for by mixed packages is not a "small" sales volume.

Separately, Petitioners argue that the allegedly small amount of mixed package sales should not be disregarded for two other reasons:  first, doing so would result in an antidumping duty calculation that is unnecessarily inaccurate, because the Department would be excluding specific sales from its analysis that otherwise should be included; second, excluding these sales from its analysis in this investigation will invite manipulation of any respondents' selling practices in an attempt to "stuff" dumped sales into mixed packages.  Petitioners state that this concern arises independent of any issue with respect to application of any resulting dumping margin and assessment of duties in mixes packages.  For example, petitioners note that a respondent (or importers like Crystal and Cleo) who knows that packages containing subject and non-subject merchandise will be excluded from the dumping calculation will have a strong incentive to engineer exactly these type of sales to achieve a lower dumping rate that is then applied to its entries.  Petitioners state that by doing so, the Chinese tissue paper producers would avoid the calculation and application of accurate dumping margins.  Petitioners state that the Department has the administrative ability to develop a reasonable methodology to address these sales in its analysis for the final determination.

To adjust U.S. price, Petitioners state that the Department should deduct the value of non-subject merchandise using public values they submitted and also suggest ways in which the margin program could be adjusted to reflect their suggested methodology.  Petitioners state that regardless of the methodology it employs, under no circumstances should the Department exclude these sales in the unlikely event that it does not apply total adverse facts available to China National.

4

**Department's Position:**

We disagree with China National.

While adjustments to U.S. price or normal value for mixed packages are moot, we stress that all subject merchandise – cut-to-length tissue paper – is subject to this proceeding, whether or not it is sold or shipped with non-subject merchandise.  In the Preliminary Determination, citing the Final Determination of Sales at Less Than Fair Value: Fresh Cut Roses from Ecuador, 60 FR 7019 (February 6, 1995) (Roses from Ecuador), we noted that we included mixed packages because the products under investigation are cut-to-length sheets of tissue paper, and not packages of tissue paper, and that packaging the subject merchandise with non-subject merchandise does not transform the subject merchandise into merchandise outside the scope of the investigation.  While China National contends that Roses from Ecuador is inapplicable because it involved a request to exclude rose bouquets from a calculation based on fresh cut roses, rather than a mixture of subject and non-subject merchandise, its reading of that case is incorrect. Roses from Ecuador clearly dealt with mixed bouquets in the same manner in which we are dealing with mixed packages here:

> Neither the Department nor the petitioner has ever attempted to include the bouquets themselves, nor any of the **other types of flowers which comprise a bouquet**, within the scope of this investigation.  The plain language of the Department's scope description demonstrates that the merchandise subject to investigation covers the roses in the bouquets only and does not expressly state that the bouquets are themselves covered.

Id., 60 FR at 7023 (emphasis added).

While we agree with China National that the Department has the discretion to disregard certain sales, we reaffirm our Preliminary Determination conclusion, which is consistent with the principle articulated in Roses From Ecuador above, that it is not necessary or appropriate to disregard China National's sales of mixed packages to the United States.[1] As we stated in the Preliminary Determination:

> CBP disaggregates cut-to-length tissue paper from non-subject merchandise, requiring separate reporting and collection of duties on

---

[1] Although the Department is not necessarily including or excluding mixed packages from the margin calculation because total adverse facts available is being applied to China National, we considered this discussion relevant for this final determination as discussed in the Memorandum to Joseph A. Spetrini, Acting Assistant Secretary for Import Administration from Barabara E. Tillman, Deputy Assistant Secretary for Import Administration, AD/CVD Operations, Regarding Application of Total Adverse Facts Available to China National Aero-Technology Import and Export Xiamen Corporation ("China National") in the Final Determination of Sales at Less than Fair Value:  Certain Tissue Paper Products from the People's Republic of China ("PRC"), dated February 3, 2005,

5

>individual cut-to-length sheets of tissue paper regardless of how they are imported. As a result, CBP, in this case, will collect duty deposits only on cut-to-length sheets of tissue paper, not the entire package of tissue paper combined with non-subject merchandise.

Id., 69 FR at 56415.

With regard to China National's argument regarding the Department's decision to adjust normal value for the mixed packages and include sales of mixed packages to the U.S. in the margin calculation, we note the Department is applying total AFA to China National. Since the Department is applying total AFA to China National, we are not using any of China National's data for mixed packages to calculate China National's dumping margin. Therefore, the precise nature of the adjustment is moot.

**Comment 2:   Calculation of the Surrogate Financial Ratios**

Regarding the overhead financial ratio, China National argues that in the Preliminary Determination, the Department included the entire amount of a line item entitled "Consumption of Stores, Colours, Chemicals" in the 2003 Annual Report of Pudumjee Pulp & Paper Mills, Ltd. ("Pudumjee") as part of factory overhead.  See Memorandum to File Through Edward Yang re Selection of Factor Values for China National Aero-Technology Import & Export Xiamen Corporation and Fujian Naoshan Paper Industry Group Co. Ltd at 15 & Ex. 8 ("Factors Valuation Memorandum").  China National argues that through consultants, it sought and obtained clarification of this line item from Pudumjee with respect to the specific amounts attributable to "colours, chemicals, and dyes used as inputs in the manufacture of paper" as compared to stores consisting of "items that are not direct material inputs."  China National argues that Pudumjee's response to its follow-up inquiry was attached as Exhibit 1 to China National's November 10, 2004 surrogate values submission.  According to China National, the Department can now more accurately calculate factory overhead by excluding the amount for direct inputs "Colours and chemicals" from the total reported amount of factory overhead in the annual report for "Consumption of Stores, Colours, Chemicals."  Alternatively, China National argues, if the Department determines to categorize "Colours and chemicals" as overhead, the Department should not value China National's reported factors for ink colors, dyes, and chemicals because to do so would constitute double counting.

China National argues that the Department should accept the above-cited email as "best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority."  See 19 U.S.C. § 1677b(C)(1)(B).  China National argues that Petitioners, meanwhile, criticized the information for not taking the form of a formal affidavit according to U.S. legal standards.  Although such a form was offered, China National argues, the email response was directly from the company; it was responsive to the relevant issues; and it is subject to verification by the Department.  China National argues that undersigned counsel had no reason to doubt the veracity of the very specific information provided and therefore included it in China National's November 10, 2004 surrogate value submission.  China National argues that the Department's practice historically has been to independently research surrogate value data in India, using resources at its disposal in the United States

or in India.  China National asserts that the Department, pursuant to its charge as investigator, is free to follow up with Pudumjee's Mr. Bansal, who provided the information by email no doubt because he understood the request was time sensitive and because it was the most efficient way to provide the information.

Finally, China National argues that the Department should continue to exclude commission expenses in the calculation of the surrogate financial ratio calculation for SG&A.  China National argues that commission expense, like brokerage and freight, is a sale specific expense and not an element of SG&A.  See Notice of Final Determination of Sales at Less Than Fair Value:  Carbazole Violet Pigment 23 from the People's Republic of China and accompanying Issues and Decision Memorandum ("Pigment 23"),  69 FR 67304 (November 17, 2004) at Comment 1.   China National therefore concludes that the Department should continue to exclude commissions from its calculation of SG&A for the final determination.

The Petitioners reiterate earlier requests that the Department should use both Pudumjee's and Ballarpur's financial statements to calculate financial ratios.  The Petitioners state that in doing so, the Department should use the 2003/2004 annual reports for those companies, as the Indian fiscal period April 2003 to March 2004 covers the POI from July 2003 to December 2004, whereas the 2002/2003 fiscal year is entirely prior to the POI.  Thus, the Petitioners claim that Pudumjee's and Ballarpur's 2003/2004 financial statements provide the correct and contemporaneous Indian surrogate company experience that should be relied upon for the final determination.  Petitioners submitted the updated annual reports in their November 29, 2004 surrogate value submission.

Citing CTVs from China, the Petitioners note the importance of including significant producers in a given industry such that the Department could calculate profit for normal value across adjacent fiscal periods when the most contemporaneous financial statements of certain major producers were not available.

The Petitioners note that, although they realize there is no need to cross fiscal periods in this instant investigation, as the most contemporaneous fiscal data for both Pudumjee and Ballarpur are available, because Pudumjee and Ballarpur represent a significant portion of the Indian paper industry, it would be inappropriate to exclude them from the final determination, as noted in CTVs from China.

As previously noted, the Petitioners also claim that the Department wrongly excluded Pudumjee's commission expenses in the calculation of its 2002/2003 fiscal year SG&A expenses.  The Petitioners contend that, for the reasons they previously provided, those expenses should be included in the analysis of the 2003/2004 financial statements, for both Pudumjee and Ballarpur.  See Petitioners' submission dated Nov. 29, 2004 at Attachments 4 and 5, respectively.

The Petitioners note that in the same manner that Ballarpur's 2002/2003 annual report provides a public, published breakout of stores of chemicals and dyes versus spare parts, its 2003/2004 annual report provides a similar breakout that is contemporaneous with the POI.  The Petitioners note that Ballarpur's 2003/2004 profit and loss statement schedule "IV" shows that the total value of all stores and spares, including colors and chemicals, was Indian Rupees ("Rs.") 3,454,010.  The Petitioners further note that Section 7 of

7

Schedule "VIII" shows that the subtotal of spare parts and components, explicitly "excluding stores," was Rs. 1,546,912. Thus, the Petitioners provide that Rs. 1,907,098, e.g., 44.79 percent of the total Ballarpur stores and spares, pertains to the spare parts and components of factory equipment, whereas 55.21 percent pertains to the stores of chemicals, dyes and inks. Additionally, the Petitioners claim that those amounts are public, published, and audited values, unlike the undocumented and unsupported private correspondence provided by China National. The Petitioners request that these foregoing values should be used to allocate Pudumjee's 2003/2004 total combined consumption of stores and spares and, directly applied to MLE and factory overhead for Ballarpur itself. See Petitioners' submission dated Nov. 29, 2004 at Attachments 4 and 5, respectively.

As discussed above, the Petitioners reiterate their argument that the Ballarpur financial statements should also be used to establish surrogate financial ratios because they provide a more complete representation of the Indian surrogate market. The Petitioners contend that the 2003/2004 Ballarpur schedules also permit the separate and specific identification of direct material stores of chemicals and coloring agents vis-à-vis factory overhead consumption of spare parts and components. Moreover, the Petitioners provided, in detail, a calculation incorporating their requested changes for the Department's review. See Petitioners' Case Brief at 57.

The Petitioners state that they have used both the classic NME analysis format and the preliminary format used by the Department for Pudumjee to analyze Ballarpur's 2003/2004 costs. The Petitioners claim that the classic NME format is helpful because it facilitates the identification of stores costs versus spares costs and identifies the remuneration paid to directors. The Petitioners also provide that by using the Department's preliminary determination ratio methodology, the financial ratios for Ballarpur's 2003/2004 fiscal year are as follows: Factory Overhead at 20.84 percent, Depreciation at 11.80 percent, SG&A Expenses at 3.49 percent, Interest Expenses at 8.60 percent, and Profit at 10.79 percent. See Petitioners' submission dated Nov. 29, 2004 at Attachment 5.

Additionally, the Petitioners state that, given that the combination of Pudumjee's and Ballarpur's 2003/2004 financial data provides the most contemporaneous and complete surrogate valuation of the paper industry in India, the Department should use those data, resulting in the following averaged ratios for both Pudumjee and Ballarpur's 2003/2004 fiscal year: Factory Overhead at 16.51 percent, Depreciation at 11.54 percent, SG&A Expenses at 4.15 percent, Interest Expenses at 6.08 percent, and Profit at 7.44 percent. See Id. at Attachment 6.

**Department's Position:**

We disagree with China National in whole and with Petitioners in part.

With regard to China National's arguments regarding "Consumption of Stores, Colours, Chemicals" in the 2003 Annual Report of Pudumjee as part of factory overhead, we disagree. Although China National submitted an email it received from Mr. Bansal, a financial officer at Pudumjee regarding "Consumption of Stores, Colours, Chemicals" in the 2003 Annual Report of Pudumjee, the information contained in this email does not

8

support China National's argument that the Department can now more accurately calculate factory overhead by excluding the amount for direct inputs "Colours and chemicals" from the total reported amount of factory overhead in the annual report for "Consumption of Stores, Colours, Chemicals."

A review of the email from Mr. Bansal shows that Mr. Bansal was simply responding to China National's request to separate the components of the "Consumption of Stores, Colours, Chemicals" in the 2003 Annual Report of Pudumjee. Mr. Bansal does not explain how those components are related to overhead or even provide further clarification as to what these items actually include. Therefore, the email from Mr. Bansal does not warrant a change from the Preliminary Determination in which the Department attributed the entire amount of "Consumption of Stores, Colours, Chemicals" in the 2003 Annual Report of Pudumjee to factory overhead as no further clarification with supporting documents has been presented to warrant such a change.

With regard to Petitioners' argument that the Department should include Ballarpur in the calculation of the financial ratios, we disagree. Currently on the record, the Department has two reliable financial statements from Pudumjee. While Petitioners have shown Ballarpur to be an Indian paper producer, no information on the record supports a finding that Ballarpur is a producer of subject tissue paper. As there are reliable financial statements from a producer of subject merchandise, Pudumjee, and as the Department's practice is to use financial statements which are specific to production of the subject merchandise, we have not included Ballarpur in the calculation of the financial ratios.

With regard to Petitioners' argument that we should include commission in the SG&A calculation, we agree. China National argues that commissions should be excluded from the SG&A calculation because it is like brokerage and freight, is a sale specific expense and not an element of SG&A and cites Pigment 23 as support. However a review of Pigment 23 shows that in that case, the Department excluded a line item called "commissions and brokerage" as it appeared that brokerage and commissions could not be separated. In this case, the "commission on sales" line item in the 2003/2004 Pudumjee financial statements does not include brokerage or inland freight as China National suggests, but can only be a selling expense as recognized by Pudumjee. Therefore, we are including "commission on sales" in our calculation of SG&A.

In the Preliminary Determination, the Department only used Pudumjee's 2002/2003 financial statements to calculate the surrogate financial ratios. However, for this final determination, the record contains Pudumjee's 2003/2004 financial statements that overlap entirely with the POI of this investigation. As such, we are relying solely on Pudumjee's 2003/2004 financial statements for purposes of calculating the surrogate financial ratios. For detailed explanation regarding the Department's calculation of the surrogate financial ratios, please see the Memorandum from Kit L. Rudd, Case Analyst to the File Through Alex Villanueva, Program Manager, Regarding the Calculation of the PRC-Wide Rate and Corroboration, dated February 3, 2005.

**Comment 3:   Request for Initiation of Circumvention Inquiry**

Petitioners note that while touring Xingan's facilities, the Department noticed the presence of an empty plastic bag labeled as containing tissue paper and marked with a

country of origin other than the PRC.  See China National Verification Report at 35.  Petitioners contend that the most likely explanation for the production of such bags at Xingan is that China National is planning, or has already commenced, to circumvent a potential antidumping duty order.

According to Petitioners, the Department's verification observations provide good cause for the Department to self-initiate an inquiry on the potential circumvention of any order issued in this proceeding, pursuant to 19 CFR 351.225(b).  Additionally, Petitioners state that should the Department render an affirmative final determination and issue an antidumping duty order for China National, the Department could and should solicit additional information regarding the specifics of circumvention efforts by China National and other Chinese respondents.

Petitioners request that the Department notify U.S. Customs and Border Protection (CBP) of the potential entries of misclassified merchandise that fall within the scope of this investigation, whose liquidation should be suspended, and whose liquidation should and will be included in the scope of an antidumping duty order for this instant case.

China National, in its rebuttal brief, states that Petitioners have assumed, without any substantiation, that the mere presence of an empty sample plastic bag was evidence of circumvention.  China National states the Department itself noted that Xingan manufactures plastic bags, as well as printed tissue paper.  See China National Verification Report at 11 ("Xingan produced polypropylene bags") and 34 ("Xingan conducts printing on a variety of media to include . . . packing materials such as paper overwrap and polypropylene bags.").  China National contends the fact that the Department identified a sample bag is no mystery and has no implications regarding subject merchandise.

**Department's Position:**

We disagree with Petitioners.

While the Department took notice of a bag printed by Xingan (labeled as containing tissue paper from a country other than the PRC) during its tour of that company's facilities, company officials explained that, from time to time, U.S. customers will ask Xingan to produce sample product bags according to specifications, and that this was an example of such a sample.  See China National Verification Report at 35.  The fact that the Department saw such a bag at verification does not, in and of itself, constitute sufficient grounds for initiating an anti-circumvention inquiry under 19 CFR 351.225(b).  However, the Department is vigilant regarding any potential circumvention of this or any of its antidumping duty orders and will respond to any such allegation it receives on the record.

**Comment 4:   Section A Rate - Max Fortune Industrial Limited ("Max Fortune")**

Max Fortune states that the Department, in the Preliminary Determination, granted it a separate rate, and that the Department determined that Max Fortune is a 100 percent

Hong Kong-owned[2] exporter of the subject merchandise whose export functions are not subject to any laws or regulations of the People's Republic of China.  Max Fortune asks that the Department affirm its preliminary determination with respect to Max Fortune by granting the company a separate rate in the tissue paper final determination.  Max Fortune argues that the Department has a statutory obligation under 19 U.S.C. § 1673d(c)(5) and the WTO Antidumping Agreement[3] to calculate for Max Fortune a company-specific margin that does not take into account margins calculated on the basis of facts available for Fujian Naoshan and/or China National.  Max Fortune reminds the Department that it has been fully cooperative and requests that the Department recognize its full cooperation in this investigation by granting Max Fortune a company-specific dumping rate.

Petitioners did not submit rebuttal comments on this issue.

**Department's Position:**

We disagree with Max Fortune in part.

At the outset, we note that no party, including the Department, has identified any information which would cause the Department to re-evaluate its preliminary decision to grant Max Fortune a separate rate.  Therefore, the Department continues to find Max Fortune merits a separate rate.

Section 735(c)(5)(B) of the Act provides that, where the weighted-average dumping margins established for all exporters and producers individually investigated are zero or de minimis, or are determined entirely under section 776 of the Act, the Department may use any reasonable method to establish the estimated "all others" rate for exports not individually investigated.  This provision contemplates that the Department may weight-average margins other than zero, de minimis, and facts available margins to establish the "all others" rate.  Where the data do not permit weight-averaging such rates, the statute and the SAA at 873 explain that we may use other reasonable methods.

As noted in the Facts Available Memo, the Department is applying total adverse facts available to both mandatory respondents who participated in this investigation.  As a result, there is no calculated margin on the record.  Additionally, because the petition contained only a single price-to-NV dumping margin, there are no other estimated margins available with which to create the rate for the tissue paper Section A respondents who received a separate rate, including Max Fortune.  Therefore, we applied the PRC-wide rate, which was a recalculated petition margin, of 112.64 percent as the rate for the tissue paper Section A Respondents receiving a separate rate.  The Department has used this method in other cases including the companion crepe paper investigation.  See Notice of Final Determination of Sales at Less Than Fair Value and Affirmative Final

---

[2] Note that on page 10 of the Department's Separate Rates memorandum the Department incorrectly stated that Max Fortune is a wholly foreign owned Canadian company, however, Max Fortune is a wholly foreign owned Hong Kong company which sourced its subject merchandise from PRC suppliers.

[3] Max Fortune argues that the WTO Antidumping Agreement requires that the Department not include margins based on partial adverse facts available when calculating a weighted-average rate for non-selected respondents.  See United States Antidumping Measures on Certain Hot-Rolled Steel Products From Japan, WT/DS184/AB/R, para. 101 (July 24, 2001).

Determination of Critical Circumstances:  Certain Crepe Paper from the People's Republic of China, 69 FR 70233 (December 3, 2004) (affirming its preliminary determination in which it applied the only calculated rate (petition rate) to the cooperating Section A Respondents receiving a separate rate); Notice of Preliminary Determination of Sales at Less Than Fair Value:  Certain Hot-Rolled Carbon Quality Steel Flat Products from Indonesia, 66 FR 22163 (May 3, 2001); Notice of Preliminary Determination of Sales at Less Than Fair Value:  High and Ultra-High Voltage Ceramic Station Post Insulators from Japan, 68 FR 325627 (June 16, 2003), and Notice of Final Determination of Sales at Less Than Fair Value:  High and Ultra-High Voltage Ceramic Station Post Insulators from Japan, 68 FR 62560 (November 5, 2003).

**Comment 5:   Section A Rate - Hunan Winco Light Industry Product Import & Export Co. Ltd. ("Hunan Winco")**

In the Preliminary Determination the Department denied Hunan Winco's request for a separate rate based upon the fact that Hunan Winco failed to provide evidence of price negotiations.  On October 25, 2004, Hunan Winco submitted what it claims to be such evidence in the form of correspondence between Hunan Winco and its customer as well as a subsequent purchase order.  Hunan Winco holds that this submission was timely because it was made seven days prior to the start of verification, pursuant to 19 CFR § 351.301(b)(1).  Hunan Winco argues that the correspondence and purchase order that it submitted on October 25, 2004, illustrates that there were bona fide negotiations between Winco and its customers.  According to Hunan Winco, the three faxes it provided in its October 25, 2004, submission showed back and forth discussion regarding price between Hunan Winco and its U.S. customer.  Hunan Winco also contends that the company has sufficiently demonstrated its independence from any government control and therefore should be granted a separate rate in the Department's final determination.

Petitioners did not submit rebuttal comments on this issue.

**Department's Position:**

The Department disagrees with Hunan Winco.

Hunan Winco stated in its May 19, 2004 submission that it sets the prices of its merchandise "through direct negotiation with its customer."  See Hunan Winco Section A Response at 4.  Hunan Winco further stated that because it "set the prices with customers through face to face or telephone negotiations, which are later reflected in the sales contract," it "did not have any written evidence of price negotiations during the POI." Id. Because Hunan Winco provided no evidence of price negotiation in its original Section A Response, the Department sent Hunan Winco a Supplemental Questionnaire asking it to "{p}lease provide evidence of price negotiations with U.S. customers, such as copies of faxes, emails, or other communications from the POI."  See Hunan Winco Supplemental Section A Response, August 2, 2004 at 4, question 15.  Hunan Winco responded that because it "negotiated prices with clients at trade fairs verbally, Winco does not have any written evidence of price negotiations."  Id.

Hunan Winco also submitted new information after the Preliminary Determination.  See Hunan Winco October 25, 2004 Submission.  Hunan Winco provided fax transmissions

12

showing price negotiation with one of its customers with no explanation of why they were not able to provide this information to the Department after the <u>Preliminary Determination</u>. The new information Hunan Winco provided flatly contradicts its previous statements already on the record from its Section A and Supplemental Section A responses that it does not maintain written price negotiation correspondence. While the Department may have accepted evidence such as affidavits that would support its statements that it conducts negotiations only face to face or by telephone, Hunan Winco instead provided evidence it previously certified did not exist. This complete change of representation regarding key facts is so extreme as to fall well outside the bounds of the type of supplementation or clarification of the record contemplated either under 19 CFR 351.301(b)(1) or a supplemental questionnaire, and therefore cannot be accorded significant weight in the Department's deliberation. The Department notes that in a recent investigation on Certain Frozen and Canned Warmwater Shrimp from the People's Republic of China ("PRC"), certain Section A Respondents who found themselves in similar situations sought to comply with the Department's requirement for documentary evidence regarding price negotiation by submitting affidavits from company officials or their U.S. customers that 1) attested to their previously noted methods of negotiating prices (<u>i.e.</u>, by telephone), and 2) stated that they do not keep price negotiation correspondences in the normal course of business. See <u>Memorandum to Edward C. Yang, Director, Non-Market Economy Unit, Import Administration, from Julia Hancock, Case Analyst, through James C. Doyle, Program Manager, Certain Frozen and Canned Warmwater Shrimp from the People's Republic of China: Separate Rates for Producers/Exporters that Submitted Questionnaire Responses</u>, dated November 29, 2004 at 47. However, Hunan Winco provided no such evidence. Instead, Hunan Winco submitted information contradicting statements that Hunan Winco repeatedly made and certified to the Department. In light of this contradictory evidence, the Department finds that Hunan Winco has not demonstrated that the terms of the sales it negotiates in person or via telephone are free of government control.

Section 776(a)(2) of the Act provides that the Department shall apply "facts otherwise available" if an interested party or any other person (A) withholds information that has been requested; (B) fails to provide information within the deadlines established, or in the form or manner requested by the Department, subject to subsections (c)(1) and (e) of section 782; (C) significantly impedes a proceeding; or (D) provides information that cannot be verified as provided by section 782(i) of the Act.

Section 776(b) of the Act further provides that an adverse inference may be used when a party has failed to cooperate by not acting to the best of its ability to comply with a request for information.

In accordance with section 776(a)(2)(B) of the Act, for the final determination, the Department is applying facts available to Hunan Winco because Hunan Winco failed to provide the information in the form or manner requested. As noted above, Hunan Winco first claimed that it did not have any documentation of price negotiation. Next, Hunan Winco reiterated its claim that it did not have any price negotiation documentation after the Department specifically asked whether it had any faxes, emails, or other communications from the POI. It was not until after the <u>Preliminary Determination</u>, that Hunan Winco provided the Department with this fax as evidence of price negotiation,

well after the Department specifically requested this information. Therefore, we find that Hunan Winco failed to provide evidence of price negotiation in the form or manner requested by the Department in accordance with section 776(a)(2)(B) of the Act.

In accordance with section 776(b) of the Act, the Department finds that Hunan Winco failed to cooperate by not acting to the best of its ability to comply with a request for information. As noted above, Hunan Winco provided contradictory evidence of price negotiation. Hunan Winco failed to put forth its best efforts to comply with the Department's requests. Therefore, we find that Hunan Winco failed to act to the best of its ability to comply with our request of providing evidence of price negotiation in accordance with section 776(b) of the Act. Accordingly, Hunan Winco has failed to establish its entitlement to a separate rate because it has not demonstrated that its export activities operate separately and apart from the government and is applied the PRC-wide entity rate. Corroboration of the PRC-wide entity rate is addressed in the <u>Memorandum from Kit L. Rudd, Case Analyst to the File Through Alex Villanueva, Program Manager, Regarding the Calculation of the PRC-Wide Rate and Corroboration</u>, dated February 3, 2005.

**RECOMMENDATION:**

Based on our analysis of the comments received, we recommend adopting all of the above changes and positions. If accepted, we will publish the final results of this investigation and the final weighted-average dumping margins in the <u>Federal</u> <u>Register</u>.

AGREE_____        DISAGREE_____


_____
Joseph A. Spetrini
Acting Assistant Secretary
   for Import Administration


_____
Date

14